Before we start with the clock, we want to talk to Council about the confidentiality markings, which seem to be inappropriate. We mark the safe as open, as though we can't discuss that here. Mr. Gard? Your Honor, if we were excessive in that regard, we apologize. We try to conform with the confidentiality markings below in this case. Well, but that's exactly the point of our rules. Just because something is marked confidential below doesn't mean it should be marked here. You're supposed to go through and determine whether there's a need for the confidentiality marking. And looking at these confidentiality markings, it seems, one, that there's no reason for the confidentiality markings in most cases, and second, that it would inhibit our discussion of oral argument and writing an opinion in the case. Well, we certainly apologize for that, Your Honor. I mean, we, I mean, certainly with respect to the one you identified, we're okay with that. I mean, if you'd like us to make a subsequent submission on that, to take another look at that, but we certainly apologize if we feel we've been excessive in our markings. Well, why don't we just go through the oral argument, assuming that the confidentiality markings don't exist, and if we get to an area where you think we're crunching on something that's a trade secret or is really confidential, let us know about that. Sure thing. Thank you, Your Honor. All right, why don't you start? Thank you, Judge Dike, and may it please the Court. The orders at issue in this appeal seek to enforce two patents concerning various components for ATMs. The first of those patents, the 616 patent, has since expired. In light of the patent's expiration, the Commission itself has asked this Court to vacate its order as to the 616 patent. And so, as the appeal concerns that patent, we would ask this Court to accept the Commission's request for vacator and to dismiss the appeal as moot to the 616 patent. But Diebold would still have an opportunity to claim that the redesign is not an adequate redesign, right? At least for that time period. It could seek to do so. Under our understanding, Your Honor, is that this Court actually accepted the Commission's request to vacate its exclusion orders, and that that would resolve the issue. If the Court did not choose to accept the Commission's request to vacate its orders, or did not remand to the Commission for it to vacate its orders itself, then certainly we think that the appeal is not moot for precisely the reason Your Honor identified. And I'd be happy to address the issues with respect to the 616 patent before we turn to the 631 patent. Well, the issue is whether they are potentially going to file in the future a sanctions request based on a violation of the exclusion order with respect to the redesigned product, right? It had a couple of years. Have there been communications about this? Diebold has indicated in its brief that it is at least pursuing that or has eyes open on that. I mean, certainly our view is that there hasn't been any violation. I mean, the Commission is... Have they suggested to you that there's a violation? I think one reading of its brief is that it's trying to keep that open. They've never suggested to us in any concrete manner that there's been a violation, and certainly we don't think there has been. But it would put them in a different position if they were claiming that there was an actual violation of the existing order because the redesign isn't truly a redesign. It would. It would, Your Honor. It would. And we think... Probably a different burden. Yes. And we think that the simplest way to resolve this is to accept the Commission's own request for a vacater. How can you do that in the face of Diebold's interest? Well, I mean, I... I mean, you're not in a very good... I mean, shouldn't we be hearing from them? And I would encourage Your Honors to ask them about it, but I think... I don't know why you have any standing to say what you think is in their mind unless all you can say is they haven't threatened you. Yes, Your Honor. And in their brief, I think they... Right. Right. And that's all we're saying, Your Honor. And we're certainly happy to... And you're personally... Your client is unaware of any communications they are making to the world to teach people how... To teach purchasers how to strip the workaround off. Yes. Yes. Now, as to the... But you haven't imported anything other than the ones with the redesign, right? Correct. At least that's what your position is. That's our position. And has the timeframe for challenging the customs determination, has that passed? I don't believe it has, Your Honor. Okay. What is the timeframe? We haven't located a precise timeframe. I wasn't able to locate one either. So... Now, with respect to the 616 patent, I think that the central error in the commission's analysis is with respect to the construction of service opening.  between an opening and a service opening. And if you could take, just to think about this, the example of the difference between an elevator and a service elevator. Just because a painter can take his equipment and take the normal elevator up to the 10th floor, doesn't make that a service elevator. Everybody knows what a service elevator is different and is there to enable service. Bringing the painting equipment up, bringing equipment up, whatever.  Is there a difference? Should we look at it differently in terms of whether the structure is capable of allowing service even if it's not the normal use for the structure? I think you would. And I think that's one of the differences between the commission's construction and the ALJ's construction. And all of this is informed, importantly, by the prosecution history. During the prosecution history, the patent office initially was not going to approve the patent because of anticipation of the prior art, the Ramachandran device, which included openings, which in theory could have been used for servicing. And Diebold's response to that was to say that in order to practice the limitation service opening, the openings had to be there for meaningful service. They had to enable meaningful service. And so there, for example, in the Ramachandran device, it was clear that you could service it from a different area. And there was no indication that the openings that the patent office initially thought were servicing. But did the commission make some factual findings that, in fact, some service that was allowed through your openings was meaningful? No, because the commission read the meaningful limitation of the ALJ's construction out of the construction. Under the commission's construction, all that's required is that it may be used for service conceivably, not even in fact. And it read out any meaningful service element of it, which is, I think, central to the ALJ's construction and central to squaring the construction with the prosecution history and Diebold's own arguments in distinguishing the Ramachandran openings. It did seem like the ALJ put a lot of extra words in there that might not have been necessary. And my question to you is, is that because the ALJ was trying, spotted a dispute between the parties even after her initial thoughts about what a meaningful construction would be? Well, I can't get it in the mind of the ALJ, Your Honor. I mean, I think she did appropriately explicate her construction. I mean, there's talk about additional words. But all she was sort of getting is the nub of this distinction between an opening and a service opening. What exactly is your position? Because it seems to me that there could be two positions different from the one that the commission adopted. One is that the opening has to allow meaningful service, which I think is what the ALJ said. The second one would be that it has to be an opening that's designed to be for service. Which is your position? It's in line with the ALJ, Your Honor. We're not asking for any meaningful service. What the ALJ said was it's an opening, this is at page 127 in the appendix, through which serviceable components are accessible for servicing, where the opening enables access to the serviceable components, and the claimed service must be meaningful. And of course... What about the 5600 series? Well, that was one where she found that it wasn't, Your Honor. But I think our central construction, we agree with... The other opening was for meaningful service. Yes. And that would be... That's a fact-specific analysis for the infringement analysis, but for the basic construction, our position is that the commission was wrong in reading out the element of meaningful service and in holding that any opening... Well, how do you know what service is meaningful? What happens if you can maybe loosen one screw, but that's all you can do? I wouldn't say that that's meaningful in any sense, Your Honor. And part of this... Why are they not meaningful? Well, part of this goes to... Is it your view that service has to allow you to complete whatever service mission you were trying to accomplish when you went in through the hole? Well... Because in the 5600, if I'm not mistaken, they were able to actually remove the keyboard, the whole... Right. Am I allowed to... Right. And I think... The hole was large enough that they could reach in under the screws and lift the keyboard out, right? I think what we're distinguishing here is the difference between the pinhole that you can blow air through and service it that way and an opening whereby meaningful service can be accomplished. And I think it's a fair understanding of the ALJ's construction is that actually being able to remove the keypad is meaningful service. Now, a lot of this goes to the actual infringement or analysis as to whether it's practicing, which would look to things like the service manuals, the positioning of screws, whether that... The 5600 infringes under either interpretation. I... Well, certainly, it infringes under the commissions. It's very broad. It can cover almost anything. You artfully sort of avoided the 5600 in the briefs, the footnote that lists out all the others. Right. It would under the ALJ's as well. That's correct. The 5600 was held to infringe under the ALJ. That's correct. And were this a limitation or the second position limitation as well? Because it seems to me that if there is a service opening in the 5600, that it's accessible from the safe, right? Right. So there wouldn't be infringement on the second limitation. I believe that's right, Your Honor. And I think one appropriate thing for this court to do would be to set aside the commission's construction and to send it back for a determination as to whether or not there's infringement practices and... What was the challenge to the ALJ's infringement findings? Did you really challenge the ALJ's infringement findings as to the 5600 other than the second position? So you didn't as to the first position? We didn't, Your Honor. Okay. So that's... So is there a reason to have to remand for that? I think it would depend on what this court said about why the commission was wrong in terms of whether or not remand would be appropriate. And I think the safest thing to do would be to just ask the commission to reconsider that. But certainly if this court believed that that machine was separate, then that would be one way to resolve it. Why don't you discuss the 631? Sure. I think with respect to that, we have two errors. One is a clear legal error in its application of the obviousness analysis in this court's case law. And the second is an expansion which you think is inappropriate of the commission's. So my reaction was that you got a pretty good argument that combining these two pieces of prior art was feasible and that's something that someone would have done. Yes. But the problem is that once you combine the two pieces of prior art, you still don't have the invention because you're not able to read numbers from checks that are put in upside down. Well, that's certainly wrong as a factual matter and I think it's wrong as a matter of prior art. These two pieces of prior art didn't read upside down checks, right? The inventions disclosed did not address reading through the paper. Didn't expressly do it. No, that's right. And they acknowledged that they couldn't at the time. But the point is, and this is the argument we make with respect to Volpa and the understanding, the question is what would a person of ordinary skill in the art know at the time of the 631 application? And that person would have known that a Micra reader, including the Micra readers in the that was known. The Volpa references... But there was an express finding of fact that in fact that wasn't the case, right? I don't... That there wasn't sufficient disclosure even with that background. I think the problem was, and this was another legal error in the analysis, is that the ALJ believed that it was necessary to disclose Volpa and the fact that you could read through paper as part of the combination as opposed to establishing the knowledge of a person of ordinary skill in the art, what that person would understand. And looking at the Kim and the Yasuhika references, that person would understand in 2007 when the 631 patent application was filed, that the Micra readers disclosing those patents could read through paper because Volpa disclosed that. There was other testimony by our expert at pages 4, 1, 2, 7 of the appendix that showed that a person of ordinary skill in the art would understand that the Micra readers could read through paper. And that's... When is this point about Volpa rights? Was that in the reply? In this case, Your Honor? Yeah. No, we addressed it in the opening brief. No, no, no, no. Not the reply brief. Sorry. In the... Before the ITC, when was it raised? Was it raised initially? Oh, I believe it was raised initially. Yeah. In the ALJ proceeding. That's right. But I think that the ALJ is an error in that. Volpa predated Kim, right? Volpa was...  So it did predate Kim by one year, but it came after Yasuhika. Right. And then Kim said you couldn't read it upside down, right? That's right. But Volpa wasn't actually published until later. And the point is, and we have testimony on this, that the person of ordinary skill in the art... And Volpa was just one reference to this. The person of ordinary skill in the art would have understood that a Micra reader could read through paper. Where do we find what the ITC said about the reason that it wasn't considering Volpa? Your Honor, that would be in the ALJ's decision because the ITC didn't address that. And it comes after the... I believe it's pages 274 to 276. And what the ALJ is talking about there is the combination of Kim, Yasuhika, and Volpa. But our point is that we didn't have to... I'm trying to see what they said about Volpa. It's the bottom of 275. It says that we didn't disclose the limitation. But here, for example, what the ALJ says is Nautilus, which is Yoson today, does not argue that, and this is on page 276, one of ordinary skill in the art would have combined Volpa's Micra station with Yasuhika or Kim. But our point is that we didn't have to allege that as a combination, Kim, Yasuhika, and Volpa. We're simply pointing to Volpa as evidence of what a person of ordinary skill in the art would have known. And that's all we have to show. But if Kim, that comes after Volpa, says that, in fact, you can't read upside down, then why isn't it a fair finding of fact to say that you might have said that Volpa would say this is what someone of ordinary skill in the art would know, but we don't accept that? I don't think you could credit that as a finding of fact because I think the legal analysis is wrong. The court never looked to the question of whether or not you could look at Kim and Yasuhika through the lens of what a person of ordinary skill in the art would understand, and that determination remained based on Volpa and other factors like the expert testimony we had here. Why did you not assert Volpa as one of the… Your Honor, initially we did. I know, and then you… Right. And because it wasn't necessary under the legal analysis. Well, now you're saying it was necessary. No, it wasn't necessary to plead it as a combination. And that initially… Wouldn't that have been cleaner just to leave it? If you really thought it was that important, why didn't you just leave it as one of the pieces of prior art that you were asserting? Because our central argument all along has been the same, which is that a person of ordinary skill in the art would have been obvious to that person to combine Yasuhika and Kim. You're really using Volpa, though, to say that you're filling a gap in the art, right? That's… Volpa is one piece of evidence as to what a person of ordinary skill in the art would have known, and the other experts… They didn't refuse to consider Volpa for that purpose, as I read what they said here. I think… I mean, our understanding was that what he said is you couldn't consider it as a combination. He never… She never answered. They considered it for the purpose that you offered it, that is, what a person of ordinary skill would understand. And they seem to, as a factual matter, reject that and define that Kim… You couldn't do that with Kim. And I guess I would… In other words, it seems to boil down to a factual issue rather than a legal issue. Right. And the reason why I don't think that is right is because I think the ALJ never really addressed the right factual question, which is, would a person of ordinary skill in the art in 2007, when the 631 patent application was filed, understand in looking at Kim and Yasuhiko that the MICRA readers disclosed in those applications could read through paper? And our answer is yes. And Volpa is simply one indication to show that that person of ordinary skill in the art would know that. I don't think, as we read the ALJ's opinion in the section that I mentioned, that the ALJ is answering that factual issue. I think what she looked at was whether or not there could be a combination and looked to the fact that we didn't argue a combination, but we didn't have to argue it as a combination. So I think if the court is otherwise with us on the obviousness… Under your theory, though, then you never really would have to have pieces of prior art that disclosed the limitations. You could just say, we don't need to cite any prior art. We can just say that there was something else out there that you should have looked at. Well, I don't think so. Because, I mean, really the inventions that are doing the work here are Yasuhiko and Kim in terms of explaining how you could have a movable reader to read checks in different directions. Right. And both of those did not read through paper. Right. And then it became apparent that the MICRA readers could read through paper. And that is just a fact that the person of ordinary skill in the art would know. And looking at those references, they would know. Those were… In other words, you're saying that Volpe would help you interpret Kim and Yasuhiko to allow reading through the paper. Exactly. They would know that when they're talking about MICRA readers, those MICRA readers today in 2007, they would read through paper. That's all we're saying with respect to Volpe. So, but again, under your theory, though, our obviousness law would change because we would say that you don't need to cite pieces of prior art that actually disclose the limitations as long as you can just have some overarching concept that something in the prior art would fill in an actual gap. That doesn't seem to make a lot of sense. I don't… That's not our position and that's not what we're arguing here, Your Honor. I mean, I think what we're saying is that the key limitations here are disclosed by Yasuhiko and Kim in talking about the use of a movable MICRA reader to read checks in different directions, a fixed MICRA reader to read checks coming in. Well, movable for different widths, fixed for different directions, and that Volpe simply shows that a person would understand that those readers could read through paper. And that would give the person of ordinary skill of the art the knowledge that was necessary to modify that. And going back to why this is such a clear legal error, if you look at the court's decision in Allied Erecting, there the court said that the mere fact that you can't just physically combine these references doesn't defeat obviousness or motivation to combine. And that's exactly what the ALJ… Well, that's where there was really no dispute as to what was well known in the art and it was a different kind of concept. This is a very specific gap filling in the prior art that you want to cite to one particular reference for. But the ALJ got hung up on the legal error that you couldn't physically combine Kim and Yasuhiko because you couldn't add a second reader. And that's at pages 273, 274 of the appendix. And that was clear error under this court's decision in Allied Erecting. And so the ALJ never really properly looked at this in terms of a motivation to combine these prior references. Under the Allied Erecting analysis, it's clear that there was motivation to combine here. The evidence supports that. But a bare minimum should send it back. I think we're about out of time. Thank you, Your Honor. We'll give you two minutes for rebuttal. Mr. Rosenzweig. Thanks. May it please the court. If we can start off at the 631 where we just ended, I think that might be most useful for continuity. Counsel just said that Volpe was one piece of evidence for the first… Sir, before you, could I just have one question on the mootness issue? Sure. Does the commission have any…assume the commission was going to institute an enforcement action on its own, is there some threshold level prima facie facts you have to be satisfied with in order to initiate? It's kind of similar to an original complaint that there would be very detailed explanations of infringement, like infringement contentions and so forth as part of… Is time ever a consideration? Until now, time has never been a problem. I can represent… Someone came in and said… Ten years later. Ten years? Ten years later would be, I think, would be a problem. The commission views it as a problem here where almost a year ago… Are there actual rules? We looked and looked and looked and couldn't find anything where the commission says if you want to have or to claim a violation of any exclusion order, you have to do so within a certain period of time after which you become aware, for instance, that the product is being imported. Until now, everyone's acted promptly, so the commission's never had a rule. And given that the civil penalties are assessed for each day of noncompliance, you run into a bit of a latches issue. So we really only have to… It would have to be enforced equitably since there are no actual rules. The commission would enforce it fairly. And in this case, it's been a year and a half since customs said that these redesigned products could come in. And it's been a year since the… Almost a year since the commission moved to dismiss on the basis that it was untimely at that point. It's the commission's view that even as of then, it was time to fish or cut bait for too late for you to bring it and bring an enforcement complaint. And here we are almost a year later with Diebold knowing about the structure, function, and operation of all of these products a year and a half ago. We're kind of incredulous that Diebold could just sort of tease out a speculative possibility of bringing an enforcement complaint and that that would require this court to issue what the commission believes to be an advisory opinion as to the 616. Is there a time limit on challenging the customs ruling, even if there's no time limit on claiming a violation of an exclusion order? I mean, ordinarily, the way that the customs rulings would work would be that you would have to have a product excluded from entry. You would have a customs protest. Then you would take… You would have a civil action in the Court of International Trade as to the customs protest as to a single excluded shipment. My question is, isn't there an ability to make a challenge the other way around where it's not excluded? Where it's not excluded… So there is no ability to challenge that. I don't know if there is an ability to do that. There was a district court case about five or six years ago where a party in Diebold's position brought an action in the District of D.C. directly under the Administrative Procedure Act. The commission filed an amicus brief saying that the commission had primary jurisdiction over these issues. These issues should be brought to the commission and that the district court should refrain. The district court didn't act on that APA lawsuit and the parties ultimately withdrew it a couple of years later. But relief is available from the commission. That's a good way to do it. Just don't act on it and the parties decide not to. Well, you know, they just don't act on it here with respect to the enforcement proceeding. But unfortunately, it creates work instead of saves work. Okay. On the 631, we have cases in the IPR context. Gensan, Ariosa. I don't know whether you're familiar with those cases. But they say that you don't have to rely on prior art. In a particular combination, you can rely on the prior art as indicating the knowledge of someone skilled in the art at the relevant time. And how is the ALJ's decision here declining to consider Volpa consistent with that line of cases? Okay. I think we discussed those in our brief. There was Dicestar. There was Randall v. Rhea. There was Ariosa. If I recall Ariosa correctly, it was sales brochures that demonstrated that products were actually out there in the marketplace, widely understood commercially. What we have here is Volpa. But you have Gensan, which more broadly talks about what's appropriate to consider in terms of the knowledge of someone skilled in the art, even though it's not part of a combination. I don't know. Did you discuss Gensan? I didn't discuss Gensan, and respectfully, I'm not familiar with that one. But what we've heard from the appellants here is that they're not resting entirely on Volpa. The council said Volpa is one piece of evidence for what a person of ordinary skill knows. And council pointed to page 41-127 of the appendix. They're relying on it to show what these other two pieces of prior art disclose. They're saying that the Volpa thing shows that some feature of these two pieces of prior art allows reading an obversely inserted check. Well, it wasn't obvious to Kim, who was actually making stuff. And it was incumbent upon Nautilus here to explain what was going on in 2007. Was there a problem with the magnets in the heads? Was there a problem with the paper transport? Was there a problem with processing with computer hardware? What was going on in 2007 such that a person of ordinary skill would understand that Volpa is actually correct, maybe? We don't know if Volpa was really correct in 2007. But there's nothing in this record other than Volpa. It's always Volpa, for example, this. But the problem I see is that the ALJ didn't discuss what reconciled the supposed inconsistency between Volpa and what Kim said about the ability of the technology. Well, Kim said that it couldn't read through the paper. There's no evidence in this record anywhere, notwithstanding what council says about other evidence about what a person of ordinary skill in the art knows. There's no evidence in this record about what a person of ordinary skill in the art knows, except for Volpa. And under those circumstances, Volpa was being used in the same way that a third piece of prior art would come in. I don't think that's necessarily true. And their Genzyme and Ariosa seems to be being used to interpret other prior art, and how someone skilled in the art would interpret that. Well, I don't know Genzyme. I know that Ariosa was showing sales brochures about what a person of ordinary skill would know was actually in the marketplace. In other words, it's the difference between a broad disclosures in the prior art versus a key limitation that they're relying on one prior art reference to disclose. Yeah, exactly. Exactly. And that's Randall versus Rhea, I think, was looking at textbooks. And there's another case also which had a whole bunch of, you rely cumulatively on a whole bunch of references to demonstrate that something was widely known. And then the two references they actually did rely on expressly didn't disclose. It's more than didn't disclose. One of them said that it wouldn't work. So this is using a piece of prior art to gap fill. And I would just like to say that it's always Volpa, for example, including on page 41-127, which is what they point to, but there are probably eight other references in the appendix to what a person of ordinary skill in the art would understand in 2007. And it's never based on trying to survey what was going on in 2007. It's just a conclusion. It cites Volpa and says, for example, and it never explains Kim's understanding to the contrary, and it never backs up Volpa with anything else. And the ALJ's decision here is reviewed for substantial evidence, and substantial evidence supports the fact that Kim and Yasuhiko failed to teach reading through the check. What about the service opening? The service opening. Which seems to be a bit questionable, just anything you could do through an opening, regardless of the design, regardless of whether you can perform meaningful service as a service opener. Well, I don't think that's a fair characterization of the commission opinion here. When you read the commission opinion, and you plainly have, the commission went through videotapes, studied the actual service that was going on through the opening, found that some of the manipulation actually performed service, removing speakers and so forth from underneath. Yeah, but that's not part of the construction. The construction is, you may service it, I guess, in any respect, right? Well, in the circumstances in which the evidence demonstrated that all that was happening was turning a screw, for example, with respect to, I think, some of the keypads there, the infringement. And where there was infringement was when there was service going on through the opening. Well, they cited to what expert testimony that said, I can fit my finger through one of those openings. I mean, how is that an opportunity for real service? But that wasn't consistent. The commission never found in its analysis of infringement that sticking a finger through the opening constituted infringement. We have the ALJ's review of the factual record here, his determination of meaningful. And then the commission says, no, we're going to strike that part of it. So what did the commission then say to support your position that they, in fact, imposed some meaningful requirement as they applied their interpretation? I think that the distinction in the results between what the ALJ did and what the commission did was that when the ALJ looked at the infringement, she concluded that... No, no. Where do we find, in the commission's decision, what I understood you to be saying, which is that even though they eliminated all this language from the ALJ's construction, they were still, in fact, applying some sort of meaningful requirement for satisfying this claim limitation? I would look at... Maybe take one of the products where the commission said the service opening limitation was met and one where the ALJ said it wasn't. So if I could just... What I'd like to try to explain, I think this answers your question. I hope it does because otherwise I guess I'll be in trouble. The ALJ concluded that some of the actual service through the opening didn't comport with her claim construction because service could also be done in the alternative up on top. And the commission didn't look at that. The commission looked at the service through the opening. Could you engage in real service through the opening? There are examples of... No, but the commission said real service through the opening. That's what I'm asking you about. Well, but the commission... Wait, wait. Don't interrupt. Where does the commission say you've got to be able to do real service through the opening? That's the problem I'm having. What the commission found, and you'll have to forgive me because I thought that this patent was moot, was that in instances with... I'm looking, for example, at appendix 51. There are a number of instances here where the infringement theory was to remove the devices of Heosungs. And the mere fact that the expert, for example, on page 51 to 52, was able to go underneath and fiddle with screws and so forth wasn't enough. Where infringement was actually found here was with respect to products that were actually serviced through the opening. It was removal, for example, of a speaker and other such things other than the... Well, can you pick one where the commission says it meets the limitation and the ALJ said it didn't? That gives us a clear distinction as to why. The clear distinction as to why is... Hold on. On the... Sorry. I apologize. I'm not as familiar with this part of the record as I should be. Do you think, though, that it is really more of a debate over the commission's infringement determinations than it should be over the claim construction? I think so. And I think that the idea that this meaningful was what they proposed below is inconsistent with the record. And it's even inconsistent with what I think they... Well, the word service is all over the specification. And it's in the term. And so the argument is that the commission read the word service out of the term service opening. The commission didn't do that here. In the opinion, and I'll maybe... The intervener, maybe Deval's counsel, remembers this a little bit better with respect to page numbers. But in instances where it was just adjusting screws, like for the keypads, the commission found that that wasn't infringement. But where Dr. Kerfess was able to go through underneath, through the opening and remove a speaker and do other things like that to accomplish a goal, that was deemed to be infringement here. All right. Well, we're out of time. Mr. Trautman? Good morning. May it please the court. To try to pick up just where we left off, unless... Hold on. Now, let's talk about mootness. Sure. Okay. So you had a couple of years here. There haven't been any complaints. You haven't identified anything which is imported in violation of the exclusion order. Why isn't it moot? It's not moot because we don't know whether or not they, in fact, violated the exclusion order. And we won't have that... You had plenty of time to find out. Why don't you know? The reason we don't know is because the activity, in terms of removing these plastic covers, would be invisible to us. And so we don't know whether or not they remove the plastic covers and ship them to customers, whether or not customers... Did you ask? What's that? Did you ask? Absolutely. And they said at the time of the customs proceeding, of course not. We're not doing that. But one of the other significant facts... It's only a few months that we're talking about, right? Or a year? Yes. Absolutely. And the answer is... And so it wouldn't have been that hard for you to find out, right? We can't go into their factory in Texas where these things are unpackaged and finished for And once they're... What are you waiting for? I mean, how are you going to find out in the future? You said maybe 10 years from now we'll figure out that... No. Your Honor, when this case is back in the district court, we expect to get discovery and find out what product... So you're going to use the district court discovery to find out where there was a violation of the commission's order. That's correct. There is no other discovery mechanism available to us, Your Honor. But really, what is your harm if we let this go? I mean, you still can, in the district court, claim that those products infringed, can't you? We certainly can, Your Honor. ITC determinations aren't binding on the district court. But if we go ahead and give a claim construction that might be different than the ITCs, that would be binding, right? Or at least on later panels of our court. It would be. And it would be authority that the district court would have to follow. You might not like it, actually. I understand that, Your Honor. In fact, I wanted to turn to the claim construction issue because I believe that, in fact, if they're right and they have repudiated the exclusive means theory, they don't have a non-infringement device. Now, Judge Klobuchar, I believe you had asked where in the record is an example of the commission finding infringement where the ALJ did not. And an example of that is the Halo 2 series. And this starts in the appendix at page 49 where the commission decision is explaining what the rationale is and then goes on to page 50 and talks about removing the speaker. And that's one example of actual service done through the service opening. Now, why did the ALJ not find that infringing? The ALJ found that not infringing because of her claim construction, which she made clear in her opinion, and this is in the record at appendix page 124, that, in her view, enablement not accessible through other means. And when you look at the difference, she said the reason I'm not finding the Halo series to infringe was because you could perform that service from above as well. That's the exclusive theory that the ALJ added in her ID. That's what we sought review on by the commission. That's what the commission rejected. And that is the non-infringement defense that made the difference between this various other models infringing and not. But that's the theory they've now repudiated, certainly clear in their reply brief. So it's unclear since when you look at that record and it goes from the appendix page 48 to 57, where the commission went through every model and cited all the evidence, all that evidence is of real service, meaningful service. And it's not simply touching a screw on our own expert. And this is quoted. So why did it change the claim construction? You're saying it's basically the same. It has to be meaningful service. I'm not sure there is a distinction between service and meaningful service. Service means service. So in your view, the commission's claim construction and the ALJ's claim construction are basically the same. No, what I'm suggesting is the ALJ's claim construction required exclusivity. What I'm saying is that the commission's claim construction. So far as it required meaningful service, they're the same. The outcome would be the same if the word meaningful were inserted. Because we proved meaningful service and the commission cited that. Being able to service from another way was the ALJ's extra. That's what she said. If you could do it from above as well as below, it's not infringing. So what kind of service did the commission find could be accomplished through the HALO 2 series? From below. Removing the speaker is one that jumps out and that's on page 50 of the appendix. So could this be... The 5600 was the same idea. They were able to actually remove the keypad. Can that be done when the safe door is open from below? It can be done when the safe door is open or the safe door is closed when it's removed out. Okay, so that construction then leads to the issue of whether the second position limitation... Let me be clear about the second... Don't interrupt. Sorry. Leads to the question of whether the second limitation... Second position limitation was satisfied if in fact the service that they found constituted service through a service opening could be accessed from below. I apologize, Your Honor. Let me try to be clear because I think the record is clear on this if the briefing is not. When the safe door is closed and the rollout trays are in the second position, the record is crystal clear and it wasn't disputed below that the service openings are not accessible. Well, sure. But when the safe door is open, they are accessible. That's correct. But the claim construction that they at one point argued below that accessible means never accessible under any configuration was abandoned. And in the reply brief, they acknowledged the correctness of our proposition, which is if there is a configuration of the device in which that element is satisfied, i.e. the safe door closed, that's enough for infringement. They acknowledge that position. What they seem to suggest is somehow there was a factual dispute as to whether or not... No, no. Safe home construction, the ITC's claim construction as to second position was wrong. That's their contention because the housing is the upper part of the device and it doesn't include the lower part and it doesn't have anything to do about whether the safe door is open or not. If it can be accessed when the safe door is open, then it doesn't satisfy the claim limitation. That's their contention. With all due respect, I don't read their position that way. They don't argue because it was not a claim construction argument they preserved below. They argue this is a matter of infringement. They said that there's not substantial evidence of infringement because you could get access to it when the safe door is open. And we pointed out... But you don't believe that they argued below that the housing, as that term is used in the claim, refers to the upper part of the machine rather than the lower part of the machine? Not as a claim construction matter, Your Honor. Okay. Let me turn as quickly as I can in the remaining seconds to the 631. Let me talk about the substantial evidence. Make it brief because we're over time. Sure. VOPA came before Kim, so if VOPA was announcing common knowledge that you could read through paper, it somehow never made it to Kim more than a year before. There was no shred of testimony that VOPA works. And if you look at VOPA, it purports to be a solution for when you don't get a very good reading. It's got a very elaborate algorithm for trying to figure out what the microcharacter is. The expert witness, which was the only basis they had for arguing that, A, this was common knowledge, and, B, was suggested could be combined, was specifically found to be not credible by the judge. And you can find this in the appendix at page 20869-71, where over the course of three pages of transcript, she explains why she didn't find their expert credible. Okay. I think that's it. We're out of time. Thank you, Mr. Connolly. Thank you. Mr. Doar, you've got two minutes here. Thank you, Your Honor. Just quickly on VOPA and reading through paper. First, the ALJ never corrected the right legal analysis established by this court's decision in Ariosa and Gensheim, which, among other things, says art can legitimately serve to document knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness. That comes from Ariosa at page 1365. Second, there is evidence in the record of what a person of ordinary skill in the art would understand as to reading through paper. I would look at note two of our reply brief. Third, one piece of art can establish the knowledge of what a person of ordinary skill in the art would know. That's Gensheim at page 1369. And fourth, the ALJ never made a factual determination on this, especially under the right legal framework. So we would urge this court to, at the bare minimum, remand for the ALJ to look at this under the right legal framework. And finally, on service opening, the clearest example that the commission's construction is different is that it flipped the infringement findings for all of the Yeosung devices except the 5600 device. And what that means is that whereas simply trying to, like, squeeze a finger through an opening could make it a service opening under the commission's construction because it may be possible to service through that. That cannot be what service opening means. It reads service out of service opening. Well, what about the service of the speaker?  Right, that was to one. It wasn't to all. But again, I mean, I think the clearest example that the commission's construction is different, read meaningful out. One, look at pages 49 to 50 of the appendix. And two, look at the results. The commission's construction flipped the ALJ's determinations. And then finally, effectively, the commission's construction means that the openings in Ramachandran were service openings. The concept of meaningful service came from Diebold itself in distinguishing the prior art patent in Ramachandran. But it was pretty weird for the ALJ to say, well, it can't be meaningful because it would be more meaningful to go from the top. I mean, I think this is part of the actual factual infringement analysis, not the construction. I mean, the basic concept that there has to be meaningful service, I think, is appropriate for the construction. Determining whether or not that limitation is met is a fact-dependent issue. And you've looked at things like service manuals, the orientation of the equipment, whether it could be service from above, typically. Those would all go into the factual infringement analysis. The basic construction, though, that the commission adopted has to be wrong because it's far broader than it needs to be. And it reads service out of service opening. What about the second position limitation? Are they correct that you didn't argue that as a matter of fact? No. I mean, our argument, the housing comes from the claim. I mean, we're simply saying you have to read it. We did challenge the claim construction. We certainly argued that housing is different than chest. But did you argue that as part of a claim construction? Or did you argue that's just simply in an infringement analysis? Our challenge on second position is on infringement, not on construction. We agreed with the construction. Which means that we have a whole different kind of review that's going on. Yes. But the problem with the commission's infringement analysis on second position is it didn't apply the right construction. It substituted chest for housing. In other words, the commission's ruling itself was not a claim construction ruling, but an infringement ruling. Yes. All right. Thank you. Thank all council cases.